Mr. Justice CLIFFORD
 

 delivered the opinion of the court.
 

 Controversies growing out of collisions between ships on navigable waters are in general of easy solution in eases where, the facts are agreed, or where there is no material conflict in the testimony of the witnesses. Few cases; however, find their way into the tribunals of justice where the witnesses examined in the case concur. either as to which vessel was in fault, or as to'the circumstances attending the collision. On the contrary, such investigations are almost always complicated and embarrassed with conflicting testimony, and sometimes to such an extent that it is exceedingly difficult to form any satisfactory conclusion upon the merits.
 

 Some of the causes which promote such contrariety of recollection are, that the moment when the collision occurs is.necessarily one of alarm, and, frequently, of consternation, and also because the disaster is seldom witnessed with much care by any persons other than those on board the respective vessels, aud all experience shows that they are quite too apt to see fault in the navigation of the other vessel, more readily than in that of the vessel, to which they belong. Where such conflict exists the inquiry is very perplexing,
 
 *662
 
 and the difficulty cau only be overcome in a satisfactory manner by a critical analysis of the testimony, and a-careful comparison of the respective conflicting statements of the witnesses with the undisputed or well-established facts and circumstances developed in the testimony.
 

 Decrees of an entirely opposite character were rendered in this case in the District and Circuit Courts, obviously on account of differences of opinion produced by the conflicting character of the testimony, and the appellants now set up a theory different froni either of those adopted in the' ' courts below, and it must be admitted that it finds some support'in the evidence exhibited in the transcript.
 

 In the investigation of such a ease the first step is to ascertain the facts material to the issue involved in the pleadings, but in accomplishing that purpose, in 'this case, it is not deemed necessary to enter much into the details of the testimony, as any such a discussion would not benefit the parties nor any one else not possessed of the entire record.' Views of the District Court were that the Nichols was in fault, but the Circuit Court was of a different opinion, and reversed the decree, and dismissed the libel. Appeal was taken by the libellant from that decree of the Circuit Court to this court. Succinctly stated, the material facts of the case, as they appear to the court, are as follows:
 

 Heavily laden with coal and iron, the schooner ’William 0. Brown was bound up Lake Erie, on a voyage from Buffalo to Chicago. Her course was west by north, and when the collision occurred she was about half way between Little’s Point and Bar Point, and about one and a half miles from the Canada shore. Statement as to the voyage of the barque A. P. Nichols is, that she came out from Detroit River early in the evening before the collision, and that she was bound down the lake to Buffalo, laden with a full cargo of corn. Undisputed fact is that she was heading east by south, half south, and that she, as well as the schooner, had competent lookouts properly stationed on the vessel. Both vessels also showed good lights, as required by law, and they were well manned and equipped. Prior to their arrival at the placa
 
 *663
 
 where the collision occurred they had met with no difficulty, and they had fair weather and a good breeze from the northeast, not exceeding six or seven knots, and.the speed of the respective vessels was about six miles an hour. Parties agree that the time and place of the collision'is truly alleged in the libel, and there is neither fact nor circumstance-in the.case1 to warrant the conclusion that it-was the result of any other, cause than faulty navigation. Inexcusable as the disaster was, the principal question is, which vessel was in fau.lt? When the vessels, came together they had sufficient sea room, and- they were both under full sail. The schooner had the wind free, and on her starboard side, but the barque was closehauled, with the wind on her port side. They were on lines which diverged not more than half a point, and which, in any event, if they continued their respective courses, would bring them into collision: Obliged to change their.course or collide, the true inquiry is, what should have been done? Clear weight of the evidence is that each vessel was seen from the deck of the other, about the same time, when they were some two or three miles apart, and as they were approaching 'each other, from nearly opposite directions it is quite clear, under the regulations enacted by Congress, that the helms of both should have been' put to port, -so that each might have passed on the port sid.e of the other, unless the distance between them, at that precise time, was so great as not to involve risk of collision. Rules of navigation are obligatory upon vessels approaching each other, from the time the necessity for precaution begins, and continue to. .be applicable as the vessels advance, so long as the means and opportunity to avoid the danger remain.
 
 *
 

 When, the tw o vessels made each other it was the mate's watch on board the Nichols, and he had command of her deck. His first -order to the man at the wheel was to keep .her off a little, so as to give the vessel ahead a good full; but as the vessels advanced, seeing that there was. danger of collision, he gave the order to put the helm “ hard up and keep
 
 *664
 
 her right off,” which, under the circumstances, was equivalent to the order to port the helm, as the helmsman stands on the weather side of the wheel, and consequently the effect of the order “hard up,” when executed, was to bring the •helm to port, and turn the prow of'the vessel to the leeward.
 

 Before remarking further as to the movements of the barque, it becomes necessary to ascertain what was done on board the schooner, as she was approaching from nearly the opposite direction, at about the same speed. Her master admits that he saw both side lights of the other vessel at the same time, and ho testifies that he immediately ordered the helm of his vessel to he put to starboard. Plain effect of that order, when executed, was to turn the prow of the vessel to the leeward, iustead of hugging the wind closer, as she should Lave done, to avoid a collision.
 

 Article eleven-of the regulations enacted by Congress provides that if two sailing ships are meeting end on, or nearly end on, so as to involve risk of collision, the helms of both shall be put to port, so that each may pass on the port side of the other.
 

 Sailing ships are meeting' end on.within th ¡ meaning of that provision when they are-' approaching each other from opposite directions, or on such parallel lines-as involve risk of collision on account of their proximity, and when, the vessels have advanced so near to each other that the necessity for precaution to prevent such a disaster begins, which can-hot he precisely defined, as it must always depend, to a certain extent, upon the state of the navigation, and the circumstances surrounding the occasion.
 

 Where vessels approaching are yet so distant-, from each other, or where the linos of approach,.though'parallel, are so far apart as not 'to involve risk of collision, that rule of navigation has no application tq .the case.
 

 Much greater --difficulty will arise in any attempt to define, with technical accuracy, the phniso nearly end on, as the language itself, is m terms somewhat indefinite. Such attempts have been made in the English Admiralty Court, but without much practical ■success. . Nearly end on, as the
 
 *665
 
 phrase is-employed in that article, may doubtless be-eon-' striied to include cases where two sailing ships are approaching from nearly opposite directions, or on. lines of approach substantially parallel, and .so near t,o each other as to involve risk of collision;- but the application of thé' rule must also be considered as subject to the same limitations and qualifications as the preceding phrase,in the same article. Decided cases may be found in the English admiralty reports where the attempt is made to definé, with precision; how great the variation may be from opposite directions, Or from parallel lines, and the case still be within the eleventh .article;, but the present case does not necessarily involve that inquiry, , as the variation, in any view .of the evidence, did not exceed half a point by the compass, which is clearly insufficient to take the case out of the operation of'that article.
 
 *
 

 Argument for the appellant is, that the distance between, the two vessels was so great when the helm of the schooner was put' to starboard that it cannot be considered as .a fault, and such, it seems, was the opinion of the district judge; but the proposition, in view of the circumstances, cannot bfe sustaiped, as it was in the: night timej and the combined- speed of the two vessels-was at least twelve miles an hour, arid none of the witnesses pretend that .more than ten or.-fifteen minutes elapsed after the second order of the master of the schooner was .given, to put the helm hard, up, before, the collision took place.
 

 Strong doubts are entertained whether the effect of the first mistake made by the schooner/would have Caused a collision if she' had then kept her course;- but the second order to put the helm hard up, was fatal'as the schooner then fell off’ even faster than the barque, and ’the collision bécame inevitable. Particular description of. the effect of. that movement need not be given, except to say that it brought the schooner directly across the bows of the barque. Confirmation of this View is derived from the conceded fact; that the schooner was struck by the stem of tho barque on
 
 *666
 
 her starboard quarter. The effect of the blow was that she sunk, and, with her cargo, became a total loss.
 

 Remaining proposition of the appellant is, that the barque is also in fault, because her helm, just before the collision occurred, was put to starboard; but it is clear that the error, if it was one in that emergency, was produced by the impending peril, which is justly chargeable to those having the control and management of the other vessel. Mistakes committed in such moments of peril and excitement, when produced by the mismanagement of those in charge of the other vessel, are not of a character to relieve the vessel causing the collision from the payment of full damages to the injured vessel.
 

 ' Appeal was taken to this court at the same time from the decree of the court below, in the case of
 
 The Phœnix Insurance Company
 
 v.
 
 James R. Slanson,
 
 claimant, &c., and the two cases were argued here together, as the parties conceded that they depend upon the same facts. All the testimony was taken in the first case, and the stipulation of the parties is,, that it should be regarded as also taken in the other, and that both cases should be heard at the same time. Libellants in this case were insurers of the cargo, and having paid the loss to the owner, they claimed that they were subrogated to his rights and interests, and that, by reason thereof, they had a lien upon the barque for the amount which they paid to the owner of the cargo. Evidently the appeal is disposed of by the opinion in the other case.
 

 Decrees aeeirmed.
 

 *
 

 Mail Steamship Company
 
 v.
 
 Rumball, 21 Howard, 384 ; The Ericsson, Swabey, 38; Lo vndes on Collision, 24.
 

 *
 

 Holt’s Rule of the Road, 64, 70, 154.