## THE TAMANEND. THE SAC CITY. THE GERMANTOWN. READING CO. v. UNITED STATES.

### Nos. 221, 255.

District Court, E. D. Pennsylvania.
Sept. 17, 1929.

Henry R. Heebner and Wm. Clarke Mason, both of Philadelphia, Pa., for Reading Co.

Calvin S. Boyer, U. S. Atty., of Philadelphia, Pa., and J. Frank Staley, Asst. Atty. Gen.

KIRKPATRICK, District Judge.

These suits arise from a collision at sea between the steamship Sac City, owned by the United States and operated as a merchant vessel, and the sea barge Tamanend, which at the time of the collision was the second of three barges in tow of the steam tug Germantown. The collision occurred shortly after 9 p. m., March 3, 1924, near the eastern end of Pollock Rip Channel, which forms one of the eastern entrances of Nantucket Sound. The channel, at the points involved in these suits, is approximately 600 feet wide, lies nearly east and west, and is marked by buoys; Buoy No. 2, the entrance buoy on the north side of the channel being somewhat farther east than Buoy No. 1, which marks the entrance on the south side. Pollock Rip Lightship was in 1924 about a mile and a half from the entrance to the channel, approximately due east. At the time of the collision, it was dark, but the night was clear and starlit. There was a moderate sea. A two-mile tidal current was running westwardly into and through the channel.

Prior to the collision, the Germantown with her tow was approaching the eastern entrance of the channel from the north on a course south southwest laid direct for Buoy No. 2, the northerly of the two entrance buoys. At the same time the Sac City was running on a course approximately parallel a mile or a mile and a half to the east of the Germantown and on her port bow. The tug and tow had a speed of about seven knots, and the steamship a speed of between four and five knots. The Sac City passed inside of the lightship half a mile to the west of it, and continued on her course to a point about half a mile farther on, where she made a turn to starboard and headed for Buoy No. 1, on a course approximately due west. This maneuver placed the two vessels upon converging courses of about thirty degrees, the Sac City about a mile from the entrance to the channel and the Germantown and her tow about a mile and a half from the entrance, and almost abeam of the Sac City.

Both vessels proceeded without change of speed or direction and without signals, reaching the eastern end of the channel at approximately the same time. The tug made a turn to starboard 75 feet from Buoy No. 2 and entered the channel, passing the Sac City at about that point. If the eastern boundary of the channel be taken to be a line drawn from Buoy No. 2 on the north to Buoy No. 1 on the south, then the tug actually entered the channel first.

The Germantown's tow was more than 3,000 feet in length and the master of the Sac City expected that, as it rounded into the channel, it would swing in a wide circle over toward the south side. I find as a fact that it did so, all barges as they made the turn passing to the south of the point where the tug had turned. The Sac City, therefore, in order to avoid collision, hugged the south side of the channel grazing Buoy No. 1 as she passed it and actually scraping bottom between Buoy No. 1 and Buoy No. 3. Either in a sudden effort to avoid grounding, or because of a momentary loss of control due to contact with the shoal, or by reason of a combination of the two, the Sac City swung sharply to starboard, and, before she could be stopped, collided with the barge Tamanend. In the view which I take of the case, the exact point of collision is not essential, but I find that it was about midchannel.

The immediate cause of the accident was the Sac City's sudden swing to starboard in the channel due to her touching bottom. She touched bottom because she steered too close to the southern bank, and her master put her there in order to avoid a collision with the tow as the flotilla swung into the channel. The exact extent to which the flotilla occupied the channel is not particularly important, nor would it really affect the result if, as the Germantown's witnesses testified, each barge as it reached Buoy No. 2 had turned sharp and followed the tug in a straight line. The Sac City's apprehension was certainly reasonable, and, even if the circular swing had not occurred, there would have been no fault in taking a course intended only to promote the safety of all the vessels in the channel. The question upon which the whole case depends is whether the Sac City was rightfully in the channel at the same time as the tug and its tow. If she had no right to be there, then she is responsible for the consequences flowing naturally from her presence

there, even though unforeseen and without additional fault on her part. If, on the other hand, the Sac City was rightfully in the channel, then the Germantown had no right to be there and must accept the consequence in the absence of further fault.

It is obvious that the presence of the tug and the Sac City in the narrow channel at the same time was a condition which either could easily and should have avoided. The fact that the Germantown had an unduly long and unwieldy tow, a condition known to both vessels, and that the Sac City had two boilers out of commission, and was therefore less responsive to direction than ordinarily (known only to the Sac City), created conditions which made it even more important to avoid entering the channel together. In such a case, the narrow channel rule, which provides for a situation where two vessels must necessarily pass within restricted limits, is not applicable, or at least its application must be entirely subordinated to the controlling question of fault in creating the situation.

It is essential to determine what rule governed the conduct of the two vessels just prior to their simultaneous entry into the channel. Speaking of the rules of navigation, the court in The Aurania and The Republic (D. C.) 29 F. 98, 104, said: "The rules are made to avoid collisions. They are applicable in circumstances only where there is some occasion for the vessels to heed each other, and from the time only when the need of precaution begins. The Nichols, 7 Wall. 656 [19 L. Ed. 157]; The Cayuga, 14 Wall. 270 [20 L. Ed. 828]." I hold that in this case the need of precaution began at the time when the Sac City, at a point about a mile southwest of the lightship, turned to starboard and headed for the channel. Whatever rule applied prior to that, as soon as the turn was made, a crossing situation developed. If the courses of the vessels as found in this opinion be plotted, it will be seen that, after the Sac City made her turn, the Germantown was never more than two points abaft her beam. It is true that the vessels did not intend to cross and that each was or should have been aware that the other was making for the channel intending to enter it, but they were upon intersecting courses approaching each other obliquely so as to involve risk of collision. It is not necessary that there shall be an intention on the part of the vessels to cross in order to bring article 19, § 1, of the Act of 1897 (33 USCA § 204), or Rule 7 of the Pilot Rules into play. It is only necessary that the continuance of both

vessels upon their courses should bring them into such proximity or under such conditions as would involve risk of collision. The Sac City had the tug and tow on her starboard hand, and therefore was bound to keep out of her way. She was the burdened vessel, and, in addition, in view of the narrowness of the channel, the character of the Germantown's tow, and her own partially disabled condition, was under the clearest kind of obligation to slacken speed and permit the flotilla to enter the channel in advance of her.

I therefore find the collision to be wholly due to the fault of the Sac City. Decrees may be submitted in accordance with this opinion.

I. I think there is not any question but that the complaint states a cause of action against the defendants within the jurisdiction of this court and this district.