A/S SKAUGAAS (I. M. SKAUGEN), as Owners of the Norwegian MOTOR VESSEL SKAUSTRAND

v.

The T/T P. W. THIRTLE, her engines, boilers, etc., and Sinclair Refining Company, a body corporate, her owner.

A/S SKAUGAAS (I. M. SKAUGEN), as Owners of the Norwegian MOTOR VESSEL SKAUSTRAND

v.

DREDGE CARTAGENA, her engines, tackle, boilers, equipment, etc., and Standard Dredging Company, a body corporate, her Owner.

Adm. Nos. 4469, 4474.

United States District Court
D. Maryland.

March 2, 1964.

Niles, Barton, Gans & Markell, Baltimore, Md. (Carlyle Barton, Jr., Baltimore, Md., advocate), proctors for A/S

Skaugaas (I. M. Skaugen), and M. V. Skaustrand.

Ober, Williams & Grimes, Baltimore, Md. (William A. Grimes, Baltimore, Md., advocate), and Burlingham, Underwood, Barron, Wright & White, New York City (Stanley R. Wright, New York City, advocate), proctors for T/T P. W. Thirtle and Sinclair Refining Co.

Skeen, Wilson & Coughlin, Baltimore, Md. (John H. Skeen, Jr., Baltimore, Md., advocate), and Kirlin, Campbell & Keating, New York City (Richard H. Brown, Jr., New York City, advocate), proctors for Dredge Cartegena and Standard Dredging Co.

THOMSEN, Chief Judge.

These consolidated libels, cross-claims and petitions arise out of a collision in Fort McHenry Channel in Baltimore Harbor between the inbound ore-carrier Skaustrand and the outbound steam tanker Thirtle. At the time of the collision Thirtle was completing a right turn from Curtis Bay Channel into Fort McHenry Channel around the dredge Cartagena, which was spudded and anchored in the west [1] (outbound) half of Fort McHenry Channel a short distance below Curtis Bay Channel. See attached sketch. The Court has found, on conflicting evidence, that Skaustrand and Thirtle collided bow-on about 100 ft. east of the center line of Fort McHenry Channel, and 300 ft. south of the stern line of the dredge, projected cross-channel. Besides the issues usually raised in collision cases, novel questions are presented by the claim of Skaustrand that the dredge was partly to blame for the collision because of its location in the channel and the whistle signals which it gave and failed to give.

The parties have agreed that all issues of liability shall be determined at this time, but that evidence with respect to damages may be presented later.

Findings of Fact

The collision occurred at 1819 [2] EST on February 4, 1963, in gathering darkness and clear weather, with a light breeze from the SW and a negligible current.

The entrance to Baltimore Harbor from Chesapeake Bay is by way of Brewerton Channel, 292° true inbound, through Brewerton Angle (a 29° turn to starboard) into Fort McHenry Channel, which is the main access channel to the inner harbor, with connecting channels leading to the drydocks in Sparrows Point, to Curtis Bay, to Dundalk Marine Terminal, and to Port Covington.

Fort McHenry Channel is 600 ft. wide. Its axis runs 141° true outbound, 321° true inbound. The center line is indicated by range lights located near its northern end. The then current chart showed a depth of 33.5 ft. in the left outside quarter of the channel, 39 ft. in the left inside quarter, 36.6 ft. in the right inside quarter, and 34.6 ft. in the inside half of the right outside quarter, which had shoaled to 28.8 ft. along the edge.

Curtis Bay Channel leads into Fort McHenry Channel from the west on an outbound axis of 087° true. It is 400

---

1. Although the axis of Fort McHenry Channel is 321° true inbound, 141° true outbound, it will be clearer to refer to its course as north and south.

2. The Court has adjusted all times and courses, recorded in the ships' books and records or stated in testimony based thereon, to give effect to the following undisputed facts: Skaustrand's course recorder graph was synchronized with her Gyro compass and with the wrist watch of her Chief Officer, and all of them showed correct time. Her bridge clock was one minute fast. Skaustrand's Gyro compass has a constant error of one degree westerly, i. e. for the purposes of this case it recorded 1° high. Thirtle's course recorder was correct as to direction, but one minute slow. Thirtle's deck and engine clocks were accurate. In each instance where there is a conflict in the evidence, so adjusted, as to when, where or whether a certain event took place, the Court has found the facts after observing the witnesses who testified in person, and considering the inherent credibility or incredibility of the testimony and records in the light of the facts (such as courses and distances) which are not disputed.

ft. wide, and is marked by lighted and unlighted buoys along its edges.

Quarantine Anchorage lies to the west of Fort McHenry Channel immediately south of Curtis Bay Channel. An anchorage for explosives lies to the east.

The distance from the intersection of the center lines of Fort McHenry Channel and Brewerton Angle to the intersection of the center lines of Fort McHenry Channel and Curtis Bay Channel is 6900 ft.

There is no special regulation limiting the speed of vessels in either Fort McHenry Channel or Curtis Bay Channel.

M. V. Skaustrand is an ore-carrier, owned by A/S Skaugaas (I. M. Skaugen), 580 ft. long, with a 75 ft. 4 in. beam, rated h. p. 9100, Diesel drive, single right-handed propeller, with a critical speed at 91–95 r. p. m. She was drawing 31 ft. 10 in. forward, 32 ft. 10 in. aft, at the time of collision.

T/T Thirtle is a tanker owned by Sinclair Refining Company, 604 ft. long, with a 78 ft. beam, rated h. p. 15000, steam turbine drive, single right-handed propeller. She had damaged her propeller several weeks before, but the damage did not significantly affect her maneuverability. She was drawing 12 ft. forward, 22 ft. aft, at the time of collision.

The Cartagena is a hydraulic-suction rectangular dredge owned by Standard Dredging Company, with a hull 171 ft. long, a 48 ft. beam, and an overall length from submerged cutter-head to stern of 240 ft. During operations, the dredge is held in position by one of two spuds, heavy bars of steel in sleeves, one at each

after corner of the dredge, which can be lowered and embedded in the channel bottom, permitting a digging range extending beyond the starboard side or the port side of the dredge, depending upon which spud is used.

Pursuant to a contract between the Corps of Engineers, U.S.A., and Arundel Corporation, and a subcontract between Arundel and Standard, the Cartagena had for several months been increasing the depth and width of Fort McHenry Channel.[3] Information as to the dredge's movements and positions was disseminated at frequent intervals by the District Commander, United States Coast Guard, through Notices to Mariners, both printed and broadcast. On January 28, 1963, the dredge suspended operations and left the dredging site because of ice in the harbor. The suspension was duly reported in Notice to Mariners No. 5, which added that dredging in the westerly half of the channel would be resumed "when weather conditions permit".

On February 4, weather conditions had improved, the dredge was towed to the dredging site, and preparations were begun to resume digging. A representative of the Corps of Engineers was aboard. The Coast Guard, having been duly notified, broadcast the following notice at 1550, 1609 and 1728 on February 4: " * * * the hydraulic pipeline dredge Cartagena is now working in the westerly half of the Fort McHenry Channel in the vicinity of the Quarantine Anchorage. The easterly half of the Fort McHenry Channel should be used by navigation during this operation, which will continue until about 8 February 1963."

3. The subcontract between Arundel and Standard adopted the following provision in the general contract (Specifications, p. II–5): "f. Obstruction of Channel. The Government will not undertake to keep the channel free from vessels or other obstructions, except to the extent of such regulations, if any, as may be prescribed by the Secretary of the Army, in accordance with the provisions of Section 7 of the River and Harbor Act approved 8 August 1917 [40 Stat. 266]. The Contractor will be required to conduct the work in such manner as to ob-

struct navigation as little as possible, and in case the Contractor's plant so obstructs the channel as to make difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage. Upon the completion of the work the Contractor shall promptly remove his plant, including ranges, buoys, piles, and other marks placed by him under the contract in navigable waters or on shore."

The dredge was placed in the channel, 40 to 50 ft. west of the position where she would resume dredging. She lay in a fixed, spudded position, almost parallel to and a little less than 100 ft. to the west of the center line of Fort McHenry Channel. Her cutter head was about 5440 ft. and her stern about 5200 ft. up-channel from the intersection of Brewerton Angle and Fort McHenry Channel, and therefore 1460 ft. and 1700 ft. respectively down-channel from the intersection of Curtis Bay and Fort McHenry Channels.

Two lighted spar buoys were placed 50 ft. to the west of the center line of Fort McHenry Channel, 700 ft. apart, the upper buoy being a little south of Curtis Bay Channel. It was also necessary to place in position and hook up a flexible steel pipeline, supported by pontoons, leading from the stern of the dredge southwesterly across the left outside quarter of Fort McHenry Channel and across the Quarantine Anchorage to Hawkins Point. The dredge suffered "cutter motor trouble" from 0800 to 1930, according to the civil engineer's daily report, but at the time of the collision, 1819, she was nearly ready to begin digging. The pontoon line had not been completely hooked up, and the dredge still had to lift her spud and be pushed by a tug to a location about 40 to 50 ft. nearer the center line of the channel. Immediately after the collision the dredge was moved away for safety, but she was returned, began digging about 2100, and dredged for about 9 hours that night.

At all material times prior to the collision a leverman was at his post at the forward end of the dredge, where the steam whistle control was located. It was part of his duty to blow passing signals to approaching traffic, as required by Coast Guard (Pilot) Rule 80.26, which is set out in the margin,[4] together with other material rules relating to dredges. He could not see traffic approaching from the rear, so a "whistle-boy" (a mature man) was stationed at the stern, on the

4. *Coast Guard (Pilot) Rules—*
    33 C.F.R., ch. 1, § 80.26: *"Passing signals.* (a) Vessels intending to pass dredges or other types of floating plant working in navigable channels, when within a reasonable distance therefrom and not in any case over a mile, shall indicate such intention by one long blast of the whistle, and shall be directed to the proper side for passage by the sounding, by the dredge or other floating plant, of the signal prescribed in the local pilot rules for vessels under way and approaching each other from opposite directions, which shall be answered in the usual manner by the approaching vessel. If the channel is not clear, the floating plant shall sound the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the plant.
    "(b) When the pipe line from a dredge crosses the channel in such a way that an approaching vessel cannot pass safely around the pipe line or dredge, there shall be sounded immediately from the dredge the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the dredge. The pipe line shall then be opened and the channel cleared as soon as practicable; when the channel is clear for passage the dredge shall so indicate by sounding the usual passing signal as prescribed in paragraph (a) of this section. The approaching vessel shall answer with a corresponding signal and pass promptly.
    "(c) When any pipe line or swinging dredge shall have given an approaching vessel or tow the signal that the channel is clear, the dredge shall straighten out within the cut for the passage of the vessel or tow."
    33 C.F.R., ch. 1, § 80.27: *"Speed of vessels passing floating plant working in channels.* Vessels, with or without tows, passing floating plant working in channels, shall reduce their speed sufficiently to insure the safety of both the plant and themselves, and when passing within 200 feet of the plant their speed shall not exceed five miles per hour. While passing over lines of the plant, propelling machinery shall be stopped."
    33 C.F.R., ch. 1, § 80.30: *"Obstruction of channel by floating plant.* Channels shall not be obstructed unnecessarily by any dredge or other floating plant. While vessels are passing such plant, all lines running therefrom across the channel on the passing side, which may interfere with or obstruct navigation, shall be slacked to the bottom of the channel."

top deck, to look out for inbound traffic. Neither of these men was a seaman nor trained for those duties.

The dredge and the pipeline were well and properly lighted.[5] The respective pilots of Skaustrand and Thirtle had no difficulty seeing and recognizing the dredge from a considerable distance. Both Skaustrand and Thirtle were showing proper range and navigation lights.[6] Skaustrand was equipped with one whistle on the foremast and another on the stack aft; they sounded simultaneously.[7] Thirtle had an efficient whistle.

Shortly before the collision, four vessels passed the dredge in the normal course of navigation, the last of which was the Norwegian vessel Havjo, outbound, which exchanged signals with the dredge for a starboard-to-starboard passing.

At 1800 Skaustrand was in Brewerton Channel, headed 293° plus, making at least twelve knots with engines at full ahead, maneuvering speed, a little less than 90 r. p. m. She began her starboard turn into Brewerton Angle at 1810, completed the turn into Fort McHenry Channel at about its center line, and steadied on a course of 322° at 1815. Skaustrand held this course until the collision. It is 1° to the east of the axis and carried her to a point about 100 ft. east of the center line of the channel at the time of the collision. Her engines had been placed half ahead at 1812, in order to give Havjo an opportunity to return to the west, outbound half of the channel after passing the dredge.

Meanwhile, Thirtle had sailed from Texaco's Curtis Bay terminal in ballast. She had just discharged a cargo of gasoline and her tanks were not gas-freed before leaving the dock. Pilot Hodges, a federal pilot, took the conn at 1805, while Thirtle was proceeding easterly (86.5°) in Curtis Bay Channel, with her telegraph on half ahead. It was changed to slow ahead from 1807 to 1811 to permit Havjo, outbound in Fort McHenry Channel, to clear the intersection with Curtis Bay Channel. About 1810 Thirtle blew one long blast signifying her intention to pass the dredge; getting no answer, she repeated the signal.

The dredge's whistle-boy had seen Skaustrand approaching Brewerton Angle, and reported her to the leverman. After Thirtle blew her first blast the leverman asked the whistle-boy to see which vessel was closer to the dredge. He ran up to the stern of the top deck, returned, and reported to the leverman that Thirtle was the closer. The leverman thereupon blew two blasts, signifying that Thirtle should pass on the starboard side of the dredge. In making his observations the whistle-boy did not take into account and was not asked to take into account either the respective speeds then being made by Skaustrand and Thirtle, or the likelihood that Skaustrand and Thirtle would meet in the vicinity of the dredge.

Thirtle acknowledged the two-blast signal from the dredge with two blasts. Her engines were put half ahead at 1811, and she proceeded easterly in Curtis Bay Channel, continuing her course a little to the left of the axis, to facilitate her turn into Fort McHenry Channel.

Thirtle's pilot would not have passed the dredge if it had not given him a passing signal, or if it had sounded a danger

5. As required by Coast Guard (Pilot) Rule 80.20, 33 C.F.R., ch. 1, § 80.20, the dredge displayed two red lights in vertical line, one above the other, on her starboard side above her superstructure. An elevated white light was synchronized with her whistle.

6. On Skaustrand, the forward range light is located on the masthead of the foremast. Her after range light is located on her radar mast on the deckhouse. The deckhouse is so located that the port and starboard running lights on either side of the bridge of the Skaustrand are 450 feet aft of her stem. The Skaustrand was showing no lights forward of her deckhouse other than her forward range light. She was deep laden with a low silhouette.

7. This may account for the uncertainty of several witnesses as to whether her first whistle signals were three, four or five short blasts.

signal, but he did not rely on the dredge's signal as an indication of Skaustrand's position or speed.

Thirtle began her turn about 1813, cutting between the two spar buoys. About 1816 she passed the NW corner of the dredge at a distance of some 75 ft., and crossed into the east half of the channel, increasing the sharpness of her turn [8] as she came abreast of the starboard side of the dredge, making about six knots. She kept her engines at half ahead and her speed slowly increased until 1817.

Skaustrand had passed Havjo in the vicinity of Fort Carroll about 1815, after Havjo had turned to the west and was partly across the center line of the channel. Skaustrand's engines were put slow ahead at 1815, but her speed remained about eleven knots until 1816 when her engines were put at dead slow ahead until 1817, by which time her speed was down to a little over ten knots.

Skaustrand never gave any signal of her intention to pass the dredge, but blew a five-blast danger signal between 1815 and 1816 upon seeing Thirtle coming around the dredge into the east half of Fort McHenry Channel. Thirtle ignored that signal, but after Skaustrand blew a second five-blast signal at 1817, Thirtle replied with one short blast, indicating that she intended to pass Skaustrand port-to-port. The engines of both Skaustrand and Thirtle were stopped at 1817.

Thirtle's engines remained stopped for the better part of a minute; then the following entries appear on her bell book and were executed: 1818 half ahead, clear of dredge; 1818 stop; 1818 full astern; 1819 stop, half ahead, struck. Her helmsman released the rudder for a few seconds shortly before the collision

to sound a general alarm, but this did not cause or aggravate the collision appreciably, although it caused Thirtle to swerve to port momentarily. The course which Thirtle followed carried her further and further east until she reached a point 100 ft. east of the center line of Fort McHenry Channel at the moment of impact or a very few seconds before.

Skaustrand's engines were not put astern until some seconds after 1818,[9] when half astern, then full astern orders were given and executed and a three-blast signal was blown.

Both Skaustrand and Thirtle were making about six knots at the time of collision. Both vessels had sheered a little, about 1° before the impact. The collision was bow-on at reciprocal courses of approximately 142° and 322°, within 1° of the axis of the channel.[10]

Neither pilot was an impressive witness. The testimony of Skaustrand's pilot and other witnesses from that vessel that she was hugging the east edge of the channel and therefore could not move further to starboard is not credible. Equally incredible are the testimony of Thirtle's pilot, the depositions of Thirtle's officers, and the sketches which they made, showing that the collision happened on or west of the center line of the channel, after Skaustrand had made a fairly sharp turn to the left in front of Thirtle. Such a turn would have carried Skaustrand directly into the dredge.

The impact occurred about 100 ft. east of the center line of the channel. This would put Skaustrand's port beam and Thirtle's starboard beam about 150 ft. to 175 ft. from the line of the starboard side of the dredge, projected down channel.[11]

8. Thirtle's turn was irregular, since the helmsman received several "starboard rudder" and "ease off" orders; the turn increased in sharpness as Thirtle began to pass the starboard side of the dredge, but still carried Thirtle's bow 100 ft. east of the center line of the channel.

9. This finding is based on conflicting evidence, including inconsistent records, one quite unsatisfactory.

10. The photographs show that Skaustrand's bow was pushed to port. This was caused by the facts that Thirtle was still in her turn at the time of impact, that the bows became locked, and that various efforts were made to disengage the vessels.

11. This finding is supported by the estimates of the most credible witnesses, by the fact that Skaustrand's course had

Thirtle's pilot first saw Skaustrand in Brewerton Channel approaching Brewerton Angle while Thirtle was in Curtis Bay Channel waiting for Havjo to pass. Although he testified that he was not able at that time to judge Skaustrand's size and speed, he did not make inquiry with respect thereto of the officers of Thirtle who were on the bridge with him. Thirtle's lookout never reported Skaustrand to the bridge, and until 1817 Thirtle's pilot conducted his navigation without proper regard to Skaustrand's size, course and speed, hoping to pass Skaustrand port-to-port because (1) he did not correctly judge her speed and (2) fatuously, he believed that Skaustrand would go far to the right, despite the shoaled edge and lesser depth in the east outside quarter of the channel.

Skaustrand's pilot saw Thirtle in the Curtis Bay Channel while Skaustrand was approaching Brewerton Angle. He could not be sure what direction Thirtle would take, but he knew that unless Thirtle stopped, she would have to come into the eastern half of Fort McHenry Channel whether she turned left (inbound), went straight ahead into the Anchorage

for Explosives, or turned right (outbound) around the dredge. Nevertheless he did not reduce Skaustrand's speed below ten knots until he saw Thirtle actually come across the center line of Fort McHenry Channel about 1816. Skaustrand had no lookout posted forward, although her bridge was 450 ft. aft of her stern. A deckboy was on the port wing of the bridge, serving as a lookout and messenger; the master, the chief officer and the helmsman were also on the bridge; but the front windows were closed, and no one reported or heard the signals exchanged between Thirtle and the dredge.

### Discussion

### Skaustrand and Thirtle

Skaustrand contends that the facts as found present a crossing situation, where the starboard hand rule, 33 U.S.C.A. 204, applies. Thirtle disputes this contention, claiming that she had completed her turn, that a meeting situation existed, and that Skaustrand violated the narrow channel rule, 33 U.S.C.A. 210. The relevant statutes (Inland Rules) are set out in the margin.[12]

been 1° east of the axis of Fort McHenry Channel ever since she entered that channel approximately on the center line and by the course which Thirtle followed in her turn to the right.

12. *Inland Rules*

33 U.S.C.A. § 203: "*Steam vessels approaching, meeting, or passing one another; banks obstructing view; leaving dock (Art. 18).* Rule I. When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other; and either vessel shall give, as a signal of her intention, one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other.

"But if the course of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of

her whistle, and they shall pass on the starboard side of each other.

"The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own and by night to cases in which each vessel is in such a position as to see both the sidelights of the other.

"It does not apply by day to cases in which a vessel sees another ahead crossing her own course, or by night to cases where the red light of one vessel is opposed to the read light of the other, or where the green light of one vessel is opposed to the green light of the other, or where a red light without a green light or a green light without a red light, is seen ahead, or where both green and red lights are seen anywhere but ahead.

"Rule III. If, when steam vessels are approaching each other, either vessel fails to understand the course or intention of the other, from any cause, the vessel so in doubt shall immediately sig-

It is apparent that the facts present neither a typical crossing situation nor a typical meeting situation. Thirtle had to make its turn into Fort McHenry Channel around the dredge, which occupied about one-third of the 600 ft. channel with the remainder of the channel further narrowed by the need for keeping clear of the dredge on the one side and the shoaling of the eastern edge on the other. On all the evidence, including various records and conflicting and largely incredible testimony from both Skaustrand's and Thirtle's witnesses, the Court has found that the collision occurred about 100 ft. east of the center line of Fort McHenry Channel, i. e. about in the center of the usable channel; that Skaustrand had not appreciably changed her course, 1° east of the channel axis since she entered the channel; and that Thirtle was making a wide sweep around the dredge, which, but for the collision, would eventually have brought Thirtle back to her own side of the channel. Thirtle had just reached 141°, the channel axis, a few seconds before the collision.

█ If it had not been for the dredge, Thirtle could no doubt have straightened up in her half of the channel before reaching Skaustrand; indeed, if Thirtle had made a slower, sharper turn around the dredge, she might have steadied on a down-channel course in her half of the usable channel before meeting Skaustrand, instead of coming partially across the middle of the usable channel, as she did. Of course, if Skaustrand had been proceeding more slowly, Thirtle would have completed more of her turn before they met.

The vessels were in a crossing situation while Thirtle was in Curtis Bay Channel and Skaustrand was rapidly coming up Fort McHenry Channel toward the dredge. In Ocean Marine Ltd. v. United States Lines Co., 2 Cir., 300 F.2d 496, 498–499, the Court said:

"The Rules of the Road prescribe certain clear-cut obligations for vessels in a crossing situation. Once they become operative no deviation from their dictates is permitted.

* * *

"Since the rules are designed to prevent the risk of collision as well as collision itself, [The Beryl, 9 Prob.Div. 137, 5 Asp. 321 [1884], cited in Griffin on Collision 23 (1949)] it is not necessary for a collision to be imminent or even prob-

---

nify the same by giving several short and rapid blasts, not less than four, of the steam whistle."

33 U.S.C.A. § 204: *"Steam vessels crossing (Art. 19).* When two steam vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

33 U.S.C.A. § 206: *"Vessel having right-of-way to keep course (Art. 21).* Where, by any of these rules, one of the two vessels is to keep out of the way, the other shall keep her course and speed."

33 U.S.C.A. § 208: *"Duty of steam vessel to slacken speed (Art. 23).* Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary, slacken her speed or stop or reverse."

33 U.S.C.A. § 210: *"Steam vessel in narrow channel (Art. 25).* In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

33 U.S.C.A. § 212: *"Special circumstances requiring departure from rules (Art. 27).* In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

33 U.S.C.A. § 221: *"Usual additional precautions required generally (Art. 29).* Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

able before the obligation imposed by them accrues. The courts have expressed this concept in various ways. Said Judge Addison Brown: '[T]here is danger or risk of collision whenever it is not clearly safe to go on.' The Aurania, D.C.S.D.N.Y., 29 F. 98, 123. While Judge Learned Hand put it thus: ' "[R]isk of collision" does not mean certainty of collision; but only that prudence demands that the navigators shall watch each other's navigation, and be prepared to do whatever safety may demand.' Socony Vacuum Transp. Co. v. Gypsum Packet Co., 2 Cir., 153 F.2d 773, 776. In short, a situation may involve risk of collision before there is actual danger, but 'when the relation between the vessels is such that danger may shortly arise, if the rules are not obeyed.' Griffin on Collision 23 (1949). Once vessels enter into such a potentially dangerous relationship, their obligations are fixed."

The fact that Thirtle was turning into Fort McHenry Channel and not entirely crossing Skaustrand's course does not prevent the application of the crossing rule.

"In the Olympic, [1913] Prob. Div. 214, 268, it was suggested that a vessel cannot base her case on such an inference as to the other's course, unless she actually drew the inference at the time and relied on it in her navigation. But if the vessels are approaching in crossing positions, the crossing rules apply, even though one vessel may intend to swing into the same channel which the other is traversing or both may intend to converge into the same channel, so that their intended courses would not, in the end, actually intersect (the Kingston [2 Cir.] 173 Fed. 992 [1909]; the Kennebec [4 Cir.] 180 Fed. 914 [1910]. When they are approaching to enter the same channel, the one having the other on her starboard hand should give way (El Isleo, 308 U.S. 378, [60 S.Ct. 332, 84 L.Ed. 335], 1940 A.M.C. 1; the Sac City [3 Cir.] 40 F. 2d 288, 1930 A.M.C. 246), and should not continue ahead in reliance on a close estimate of the courses and speeds. 'The starboard hand rule is intended to avoid just such speculations.' (Ward, J., in the Ashley, C.C.A. 2, 221 Fed. 423 [1915])." Griffin on Collision, § 44, p. 116.

This Court concludes that the starboard hand rule applied, and that Thirtle was guilty of a statutory fault in violating it.

■ But even if the crossing rule did not apply, Thirtle was guilty of serious faults which contributed to the collision. Her advocates rely on the narrow channel rule, 33 U.S.C.A. § 210, to show that Skaustrand was negligent in failing to keep to the right of the center of the available channel. Thirtle was equally guilty of this fault. Thirtle violated Coast Guard (Pilot) Rule 80.27, note 4 above, by turning around the dredge at a greater speed than permitted by that rule. Thirtle's lookout was negligent in never reporting Skaustrand to the bridge; this fault is important because Thirtle's pilot apparently gave his full attention to passing the dredge, and did not consider the danger presented by Skaustrand's rapid approach until much too late, although he claimed or admitted that he had been unable to judge Skaustrand's speed. Thirtle continued her sweeping turn at a speed of six knots or so in the fond hope that Skaustrand would swing far to the right in an impossibly short time for such a heavily laden ship in a shoaling channel. Thirtle failed to stop her engines until too late, and, generally, did not take proper steps to prevent the risk of collision or to avoid the collision when it became imminent. The situation was such that both vessels should have observed the special circumstances rule, 33 U.S.C.A. § 212, and the precautionary rule, 33 U.S.C.A. § 221.

■ Skaustrand was also guilty of serious faults which contributed to the

collision, even though, as the Court holds, she was entitled to the benefit of the starboard hand rule. Primarily, she was guilty of excessive speed in the principal channel of Baltimore harbor, partly blocked by a dredge. In A. H. Bull S.S. Co. v. Chesapeake S.S. Co., 4 Cir., 101 F.2d 599, 601 (1939), the Court said:

"The situation demanded that both vessels navigate the channel where the collision occurred with at least some degree of caution. This court has held that ten or twelve miles an hour is excessive speed in the Fort McHenry Channel. The Acilia, 4 Cir., 120 F. 455. There the court said [page 458]: 'Full speed in these dredged channels, when about to pass other vessels, is undeniably a fault which increases every risk of navigation. Appleby v. The Kate Irving (D.C.) 2 F. [919], 924.'"

Skaustrand should have maintained a proper lookout forward, especially since her bridge was 450 ft. aft of her stem, and the forward windows of her bridge were closed, which may well have contributed to her failure to hear the signals exchanged between Thirtle and the dredge. The Vedamore, 4 Cir., 137 F. 844 (1905); Harbor Towing Corp. v. Tug Reliance, E.D.Va., 211 F.Supp. 896 (1963); Griffin on Collision, § 107, p. 271; cf. Osaka Shosen Kaisha, Ltd. v. Angelos, Leitch & Co., Ltd., 4 Cir., 301 F.2d 59 (1962). When Thirtle came out into the channel Skaustrand's pilot should have realized the potential danger and should have changed his course (the Court does not believe his testimony that it was impossible) and should have reduced his speed sooner than he did.

As the Fourth Circuit said in A. H. Bull S.S. Co. v. Chesapeake S.S. Co., supra, 101 F.2d at 601:

"It was the duty of both vessels when confusion became apparent to order full speed astern and to blow danger signals. Neither vessel did this until too late to avoid the collision. As was said by the Supreme Court in the case of The New York, 175 U.S. 187, 20 S.Ct. 67, 75, 44 L. Ed. 126: 'The lesson that steam vessels must stop their engines in the presence of danger, or even of anticipated danger, is a hard one to learn, but the failure to do so has been the cause of the condemnation of so many vessels that it would seem that these repeated admonitions must ultimately have some effect. We cannot impress upon the masters of steam vessels too insistently the necessity of caution in passing or crossing the course of other vessels in constricted channels.'"

Both Skaustrand and Thirtle were at fault.

### The Dredge

Skaustrand's advocate contends that the dredge was partly to blame for the collision (1) because it unnecessarily obstructed the channel, and (2) because of the whistle signals it gave and failed to give.[13]

(1) Skaustrand argues that the dredge should not have been brought into the channel until she was ready to begin digging, and that her presence there violated the contract under which she was working, and Coast Guard (Pilot) Rule 80.30, note 4 above, which provides: "Channels shall not be obstructed unnecessarily by any dredge or other floating plant."

▪ The relevant contract provision is set out in note 3 above. It did not contemplate that the dredge would be moved in and out of the channel each day; rather it contemplated that she would remain on location until the work was completed. The contractor was required "to conduct the work in such manner as to obstruct navigation as little as possible, and in case the Contractor's plant so obstructs the channel as to make difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an

---

13. Thirtle's advocates have not argued that the dredge was at fault, but stated that they would not abandon any right to contribution which the Court might find.

extent as may be necessary to afford a practicable passage." That requirement was not violated, because at least half of the channel was left free at all times and many ships passed the dredge safely.

In The Freeport, 4 Cir., 99 F.2d 842 (1938), a dredge which was engaged in deepening a 120-ft. cut channel in the Rappahannock River under a contract with the federal government was placed at an angle which left at least half the channel free and open to navigation. A tug, towing a barge, lost steerageway while passing the dredge and stranded on the north bank of the channel opposite the dredge. The bow of the barge struck the tug's stern, causing damage to both tug and barge. At the time of the stranding the dredge was not actually sucking up mud; that operation had been suspended in order that pipelines might be moved farther down the river and, while that was being done, minor repairs were made on the engine. Rejecting a contention that the dredge was not working and was unnecessarily obstructing the channel because she had not pulled up her spuds and moved on to the south side of the channel, Judge Parker said:

"The Act of March 3, 1899, ch. 425, sec. 15, 33 U.S.C.A. § 409, relied upon by appellee, has no application, since, for the reasons stated, the dredge was not tied up or anchored in such a way as to prevent or obstruct the passage of other vessels or craft. Nor were rules 12 and 14 adopted by the Board of Supervising Inspectors violated, since the channel of the river was not unnecessarily obstructed and clear passage was afforded by the dredge. The rule applicable is that a dredge lawfully engaged in digging will be regarded as free from fault if there is ample free water for passage. The Overbrook, D.C., 149 F. 785; The Anna W., 2 Cir., 22 F.2d 273, 274. As said by this Court in The Caldy, 4 Cir., 153 F. 837, 840, 'If a vessel anchors at a point in a channel where, notwithstanding such anchorage, other vessels, navigated with the care the situation requires, can safely pass, then she has neither violated the statute, nor rendered herself liable under the general rules applicable to navigation, even though to a certain extent she has obstructed the channel.' See, also, The Strathleven, 4 Cir., 213 F. 975, 977 * * *."

■ Of course, as Skaustrand argues, a dredge is bound to exercise reasonable precautions under the circumstances, and not to obstruct a channel unnecessarily. Cahill Towing Line, Inc. and The Anna W., 2 Cir., 22 F.2d 273 (1927); Bailey Gatzert, 9 Cir., 179 F. 44, 48 (1910); Spencer on Marine Collisions, sec. 118 (1895). Relying on these authorities, Skaustrand argues that the dredge should not have been brought into the channel until she was ready to resume dredging. The evidence shows, however, that some preparations had to be made while she was on or near location, and that she was almost ready to resume digging when the collision occurred. The repairs to the cutter motor were completed about an hour after the collision, and it would have taken that long to complete the hooking up of the pontoon line and to have a tug push the dredge to her working position nearer the center line of the channel.

■ The Court concludes that the dredge was not obstructing the channel unnecessarily at the time of the collision.

(2) Skaustrand also argues that the dredge invited Thirtle into collision with Skaustrand (a) by sounding a two-blast whistle to Thirtle (calling for a starboard to starboard passage) after Thirtle had signalled her intention to pass the dredge, and (b) by failing to sound a danger signal. Skaustrand bases its argument on Pilot Rule 80.26, Passing Signals, set out in note 4 above, which provides in pertinent part:

"(a) Vessels intending to pass dredges or other types of floating plant working in navigable channels, when within a reasonable distance

therefrom and not in any case over a mile, shall indicate such intention by one long blast of the whistle, and shall be directed to the proper side for passage by the sounding, by the dredge or other floating plant, of the signal prescribed in the local pilot rules for vessels under way and approaching each other from opposite directions, which shall be answered in the usual manner by the approaching vessel. If the channel is not clear, the floating plant shall sound the alarm or danger signal and the approaching vessel shall slow down or stop and await further signal from the plant."

■■ The signals called for by the first sentence of Rule 80.26(a) are the signals prescribed by Pilot Rule 80.4, 33 C.F.R., ch. 1, § 80.4(a), which is identical with the first two paragraphs of Rule I in 33 U.S.C.A. § 203, set out in note 12, above. There is no dispute about that. Skaustrand argues, however, that the second sentence of Rule 80.26(a) requires the dredge to act as a sort of traffic officer, and decide which vessel shall pass her first. The dredge argues, on the other hand, that the words "If the channel is not clear" deal only with obstructions in the channel appurtenant to the dredge herself, and does not place what would be an impossible burden on the dredge to estimate the respective courses, speed and intentions of any two or more vessels which may be approaching the dredge from various angles. No authority cited or found imposes such a burden on the dredge. The only authority cited by either side, Keystone Tankship Corp. v. M. V. Sandanger, etc., D.Or., 1953 A. M.C. 1837, does not even suggest such a duty. The words "If the channel is not clear" refer to conditions created by the dredge or its owner or of which the crew of the dredge have better information than the vessel seeking to pass, as where a small vessel under way may be hidden by the dredge. They do not refer to a condition such as that presented here, where Skaustrand and Thirtle were in full view of each other and each was as well or better able than the dredge to judge the course, speed and intention of the other.

■ Even if there were such a duty on the dredge as Skaustrand contends, to which the Pennsylvania rule might apply, the evidence in this case shows that the signals given or not given by the dredge did not and could not have contributed to the collision, because Thirtle's pilot did not rely on the dredge's signal as an indication of Skaustrand's position or speed.

■ Finally, the faults of Skaustrand and Thirtle were so gross as to bring into play the rule stated by Chief Justice Fuller in The Victory (The Plymothian), 168 U.S. 410, at 423, 18 S.Ct. 149, at 155, 42 L.Ed. 519, as follows:

"As between these vessels, the fault of the Victory being obvious and inexcusable, the evidence to establish fault on the part of the Plymothian must be clear and convincing in order to make a case for apportionment. The burden of proof is upon each vessel to establish fault on the part of the other.

"The recognized doctrine is thus stated by Mr. Justice Brown in The Umbria, 166 U.S. 404, 409, 17 S.Ct. 610 [41 L.Ed. 1053, 1057]: 'Indeed, so gross was the fault of the Umbria in this connection that we should unhesitatingly apply the rule laid down in The City of New York [Alexandere v. Machan], 147 U.S. 72, 85, 13 S.Ct. 211 [37 L.Ed. 84, 90], and The Ludvig Holberg, 157 U.S. 60, 71 [15 S.Ct. 477, 39 L.Ed. 620, 624], that any doubts regarding the management of the other vessel, or the contribution of her faults, if any, to the collision, should be resolved in her favor.'"

■ Both Skaustrand and Thirtle were at fault and should contribute to the damages. The dredge Cartagena was not at fault. Counsel will prepare an appropriate interlocutory decree.